## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **THE BEVILL COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 01-2524-CM** |
| | ) | |
| **SPRINT/UNITED MANAGEMENT CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff The Bevill Company, Inc. ("Bevill") brings this case claiming that defendant Sprint/United Management Company ("Sprint") breached its contract with Bevill by attempting to terminate the contract for convenience without first complying with the contractually-mandated requirement that Sprint use "all due effort" to reach an agreement as to a "cure plan or the future direction of the program" governed by the contract.  This court held a bench trial on August 27–29, 2007.  The parties completed post-trial briefing on December 17, 2007, and the court has reviewed the additional evidence that the parties submitted but did not present in open court.  The court is now prepared to issue its findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a). For the reasons set forth below, the court concludes that Bevill is not entitled to recover on its claims.

### Findings of Fact

#### The Contract

1.     On August 1, 2000, Sprint and Bevill entered into a "Master Service Agreement" ("MSA"), which provided that Bevill would supply dial-up internet access services to soldiers on

United States military bases as described in the "Contract Order."  The court will refer to the

MSA and the Contract Order together as the "Contract."

2.    Sprint had a separate contract with Army & Air Force Exchange Services ("AAFES") to

provide telecommunications services to the military bases.

3.    The Contract included Bevill's projections of "Anticipated Subscribers" for the internet

services.  Robert Bevill, who jointly owns Bevill with his wife, projected that within twelve

months, he would achieve 20% of the population on each military base.  Although Mr. Bevill

testified at trial that the 20% number represented a "maximum," the court finds his testimony

not credible on this issue.  It is not a reasonable reading of the contractual language.

4.    Sections D and E of the Contract Order contemplated that the parties would begin with a

three-month test period (referred to as the "Acceptance Procedure"), using four of the

potential sixteen military bases to "evaluate program viability and profitability," before

deciding whether to proceed with the contract.

5.    Bevill and Sprint agreed to meet after three months to review program performance statistics

and determine "the future direction of the program."  If Bevill had met "penetration levels

and profitability goals," the program would proceed.  But if the program goals had not been

met, the parties were to work together to agree on a cure plan.

6.    Sprint reserved the right to terminate the Contract for convenience if the parties were unable,

after "all due effort," to reach an agreement on a "cure plan or the future direction of the

program."

7.    The Contract also provided that either party could terminate the Contract for cause:

> If a party believes that the other party has materially breached this
> Agreement or a Contract Order or both, that party may give the other

> party a material breach notice, identifying the action or inaction that is
> the basis of the breach. The party that gave the breach notice may
> terminate this Agreement or the affected Contract Order or both if the
> breaching party has not cured the breach within 30 days after the date
> of the breach notice. Unless otherwise provided in the notice or unless
> the breach has been cured, termination is effective 31 days after the
> date of the notice. . . .

(Ex. 3, § 4.3).

8.     The parties did not mutually agree that Bevill would provide high speed digital subscription

line service, or "DSL," under the Contract.  Although the court believes that Mr. Bevill

hoped that he would soon be able to provide DSL services to the military bases—and

perhaps assumed that eventually he would do so—he did not bargain for that right in the

Contract.  Notably, the Contract specifically identified local dial-up connectivity to the

internet and equipment requirements that coordinated with dial-up services.

9.     Testimony presented at trial also supports a finding that the Contract was only for dial-up

services.  Mr. Bevill testified that he sought permission from Sprint and AAFES to provide

DSL services.  If Mr. Bevill's understanding of the contract were truly that it allowed him to

provide DSL, he would not have found it necessary to seek permission.  Moreover, Bevill's

business plan referenced only dial-up services.

**Discussions on Continuing the Program**

10.    The parties held their trial-period meeting on October 3, 2001.  Mr. Bevill, Charles Carlton,

and Daniel B. McDyre, Jr. attended the meeting.  At that time, Bevill had been providing

dial-up internet service to Fort Polk for eight and one-half months, Fort Drum for six months,

Edwards Air Force Base for three months, and the Presidio for three months.

11.    Bevill's records showed that at that time, Fort Polk had 140 subscribers, Fort Drum 36,

Edwards Air Force Base 43, and the Presidio 39, for a total of 258 subscribers.

12.     During the meeting, Sprint representatives expressed concern that the program was not demonstrating sufficient penetration (enough subscribers) and profitability.

13.     Sprint told Bevill that Sprint expected Bevill to achieve a trial period subscription level equal to 5% of each base population, totaling 533 subscriptions, but Bevill disagreed and indicated that it would be difficult to reach.  Sprint's 5% goal was one-fourth of the Contract's long-term program estimation of penetration levels at 20% of the base population.

14.     After stating Sprint's position, Mr. Carlton left the meeting.  Mr. McDyre and Mr. Bevill then discussed the break-even point for Bevill to make the trial program profitable.  Mr. Bevill advised Mr. McDyre that he would need 100 subscriptions per base, or a total of 400 subscriptions, to break-even.  Mr. McDyre told Mr. Bevill that Bevill would need to achieve the 400 subscriptions before they could "talk about going forward."

15.     The parties did not reach an agreement about what the goals should be at the October 3, 2001 meeting, although Mr. McDyre thought Mr. Bevill understood what Bevill would need to achieve to discuss continuation of the program.

16.     A few days after the meeting, Mr. McDyre and Mr. Bevill talked again, this time by phone. During the phone conversation, Mr. Bevill suggested a trial period goal of 283 subscribers. Bevill's 283 goal was 5% of Sprint's telephone customers on the bases rather than 5% of the base population.  Mr. McDyre did not accept Bevill's proposal.  The parties remained at an impasse, stemming in large part from their disagreement about whether the program's long-term goal was to be 20% of the total base population or 20% of the Sprint telephone service subscribers.

17.     On October 15, Mr. Bevill sent an e-mail to AAFES complaining about the goal suggested by Sprint, again confirming that the parties had not yet agreed on the program's goals.

18.  Bevill and Sprint did not ever agree on the goals and the penetration levels necessary to go forward.

19.  The court finds that Sprint's discussions with Bevill on October 3 and afterward were attempts to comply with the Contract's requirement that the parties work together to develop a formal, written cure plan.  But a cure plan could not be developed until the parties agreed on the goals of the program.

20.  Sprint's efforts were reasonable and constituted "all due effort" to reach an agreement on a cure plan or the future direction of the program.  The parties were simply too far apart to reach an agreement.  Although the parties did not define "all due effort" in the Contract, the court determines that it means something less than significantly altering the expectations set in the Contract by Bevill's own numbers.  Mr. Bevill included in the Contract projections that his company would reach 20% of the base population within a year.  His attempt to modify those projections to numbers significantly lower than anticipated was unreasonable and the cause of the stalemate.

21.  The court rejects Bevill's suggestion that Sprint was not acting in good faith by insisting on an impossible goal—in Mr. Bevill's words, mandating that Bevill sell dial-up to soldiers without Sprint phone service.  Mr. McDyre testified in deposition that at the time the parties entered into the Contract, Sprint's penetration rate for its phone service was around 40–50% of base population.  Asking Bevill to reach 5% of the population—or even 20% for that matter—would not necessarily require Bevill to reach any members of the military who did not already have Sprint phone service.  The court finds that Sprint was concerned with Bevill's past and potential performance, and was making a good faith effort to reach an agreement on a goal that, if met, would allow the parties to continue with their contractual

relationship.

**Termination for Convenience**

22.     Sprint issued a notice of termination for convenience on October 23, 2001, to be effective ten

days later.

23.     Sprint exercised its rights under § 4.2 of the Contract because the parties could not agree on

goals or a measure of success for the program.

24.     Plaintiff filed this action on November 2, 2001.

**Sprint's Review and Reconsideration of Termination for Convenience**

25.     In November 2001, Sprint agreed to reconsider its notice of termination for convenience.  On

November 12 and 27, 2001, Mr. McDyre requested that Mr. Bevill provide a business plan

and other financial and business information.

26.     Mr. McDyre again requested a soft copy revenue report that had been requested on October

3, 2001, but never received, to set up commission payments from Bevill to Sprint and

AAFES under the Contract.

27.     On December 3, 2001, Bevill emailed a soft copy revenue report ("Sprint Internet Signups"),

with a note representing that Bevill had established an escrow account for contract

commissions.  The bottom of the Sprint Internet Signups spreadsheet read "Only 21 to

go!!!," which indicated that Bevill and Sprint were still not on the same page as to the

measure of success for the program.

28.     On December 28, 2001, Mr. Bevill and his counsel met with Mr. McDyre and Kevin Lipps

of Sprint to discuss Bevill's financial information and whether the termination for

convenience should be reconsidered and the program expanded beyond the trial period.

29.     Prior to their December 28, 2001 meeting, Bevill provided Sprint the following: (a) bank

records from Bevill showing a 10/31/01 balance of zero; (b) Merchant's Bank Statements for the account of World Wide OnLine—another of Mr. Bevill's companies—reflecting deposits from services under the Sprint/Bevill contract paid for by credit card; (c) deposit slips for the World Wide OnLine account showing deposits from individual soldiers; (d) Bevill's business plan, which reflected total assets of $81.00; (e) Bevill's financial information, including documents labeled Profit and Loss Statements and Annual Reports, one of which suggested that Bevill had approximately $33,000 cash as of 12/17/01; and (f) the December 3 e-mail and attached sign-up report indicating that Bevill's goal (according to Bevill) as of 12/31/01 was a total of 283 subscriptions.

30.     In December, Sprint received notice that some of Bevill's equipment was being repossessed, raising concerns that some customers might lose service.

31.     Sprint's review of the materials provided by Bevill indicated that Bevill was commingling program moneys or placing them in other accounts of Mr. Bevill, including a World Wide OnLine account and a personal checking account.  Sprint also discovered that the bank account attributed to "The Bevill Co." was also an account in Mr. Bevill's name personally, and that it had an ending balance of zero as of October 31, 2001.  Mr. Bevill testified in his deposition that he did not know what happened to the commissions deposited in the World Wide OnLine account.

32.     Although Mr. Bevill promised to establish an escrow account and told Mr. McDyre that he had established one, he never did.

33.     Mr. Lipps also analyzed Mr. Bevill's contention that 100 subscriptions per base was a break-even point for profitability and concluded that it would instead be 150 subscribers per base for sixteen bases.

34.     Bevill never paid Sprint any commissions, although Mr. Bevill testified at trial that he was prepared to pay commissions due at the October 3, 2001 meeting.  There was no money in the account to pay commissions.

35.     The total amount of commissions due to Sprint was $3,235.89.

36.     Bevill admitted at trial that he spent some of the money on personal expenses.

37.     Sprint concluded its reconsideration in November and December 2001 without reaching an agreement with Bevill as to the goal or future direction of the program.

38.     On January 21, 2002, Mr. Lipps wrote Bevill, stating that upon further consideration, Sprint decided not to change its decision to terminate the Contract for convenience. The letter states, in part:

> Although under the contract no reasons are required to terminate the contract for convenience, I will tell you that in addition to the considerations and concerns that Sprint previously had, the information that you recently provided to Sprint indicates: (1) commingling of funds of the Bevill Company with personal and other business interests; (2) a failure of the Bevill Company to pay bills, resulting in repossession of equipment used to perform the subject contract; and (3) the continued absence of a reasonable and achievable business plan that would show a likelihood that your company could actually achieve profitability.

(Ex. 4).

39.     Again, the court finds that the efforts by Sprint to reach an agreement as to a cure plan or the future direction of the program were reasonable and constitute "all due effort" as required by the contract.

**Termination for Cause**

40.     On March 13, 2002, Sprint issued a notice of termination for cause to Bevill.  The notice of termination for cause recited numerous grounds, including: (1) failing to account to Sprint

for or pay commissions due to Sprint under the Contract; (2) allowing commission funds to be held by an entity that had no legal right to receive or hold them; (3) failure to maintain accounting records in reasonable detail to accurately reflect transactions; and (4) commingling of funds with other entities.

41. Bevill breached the contract with Sprint in numerous ways: (1) by commingling funds; (2) by transferring or providing all Contract money to Mr. Bevill or others (not The Bevill Company); (3) by failing to pay Contract funds and commissions; (4) by making false statements to Sprint concerning the creation of an escrow account; (5) by making false statements to Sprint about the existence of Contract moneys in an escrow account; and (6) by providing false financial statements and information.

42. The court finds that these breaches of contract were material and that Sprint believed that the breaches were material. Mr. McDyre testified that the breaches were material, and the court finds his testimony credible. Bevill's act of supplying dishonest and inaccurate information, even if unintentional, undermined Sprint's confidence in Bevill and the viability of the program. The commingling and use of funds by Mr. Bevill impacted Bevill's ability to perform under the Contract and Sprint's ability to rely on Bevill. The non-payment of the Contract commissions due to Sprint deprived Sprint of the benefit of the Contract; the commissions were all that Sprint was to receive under the Contract.

43. Mr. Bevill testified that Sprint knew he was commingling funds and that Sprint was "amenable" to it. But Mr. McDyre testified that he did not know that Bevill was running credit cards through the World Wide Online account until December 2001. The court finds Mr. McDyre's testimony on this issue credible. Specifically, the court notes that when Mr. Bevill testified during direct examination, his testimony was polished and unequivocal. But

during cross-examination, Mr. Bevill was not as convincing.  The court considers his performance on the witness stand, among other factors, when evaluating his overall credibility.

44.  The court also finds unpersuasive Bevill's argument that the non-payment of commissions was immaterial because Sprint's revenues are so large and the amount owed was small.

45.  Although Bevill received the notice of termination for cause, it did not respond or attempt to cure the defaults.

46.  Neither Bevill's act of providing false statements and financial information nor its failure to pay commissions was a breach that Bevill could have reasonably cured.  Dishonesty is not easily remedied.  And because Bevill's account had no balance as of the end of October 2001, Bevill could not have paid commissions.

**Bevill's Performance Terminated April 30, 2002**

47.  On April 4, 2002, this court granted summary judgment in favor of Sprint based on Sprint's termination for convenience.  That order did not become final and subject to appeal until June 17, 2002, following the court's disposition of Bevill's motion to alter or amend or for new trial.  Bevill appealed at that time but did not seek to stay the effect of the court's judgment.

48.  On April 30, 2002, Bevill's actual performance of the Contract was terminated, under both the notice of termination for convenience and the notice of termination for cause.  Prior to that date, by agreement, Bevill had continued performing under the Contract on the four military bases.

**Damages**

49.   Bevill offered evidence of damages in the form of the value of DSL services provided by

Sprint to military bases subsequent to the termination of the Contract.

50.   Bevill did not demonstrate to the court that it had the capability of making similar sales of

dial-up services or that it was capable of making a profit under the Contract.  Mr. Bevill's

financial practices demonstrated a lack of attention to detail that indicates to the court that

Bevill was not going to become profitable at providing services under the Contract.

Combining this with the phase-out of dial-up services and the emergence of DSL, the court

finds that Bevill would not be able to make a profit, or at least one comparable in any way to

Sprint's.

51.   The money Sprint made selling DSL services was not indicative of money that Bevill would

make if Sprint had not terminated the Contract.  Bevill did not present evidence showing that

Sprint's expenses would be similar to Bevill's.

**Conclusions of Law**

52.   The Tenth Circuit remanded this case for the court to resolve an ambiguity in the

Contract—that is, whether Sprint was required to give "all due effort" before unilaterally

terminating the Contract under the termination for convenience clause.  The facts presented

at trial, however, eliminated the need for the court to resolve the ambiguity.  The court

assumes for purposes of this order that Sprint was required to give all due effort before

invoking the termination for convenience clause.

53.   Bevill claims that Sprint breached the Contract "by attempting to terminate the contract for

convenience" without first complying with the requirements of the Contract Order

concerning a cure plan.  (Doc. 119,  Pretrial Order, §5(a)).  Bevill's only alleged measure of

-11-

damages is lost profits.  (Docs. 119 and 151).  The court concludes that Bevill's claim fails for several alternative reasons.

54.   The court's first conclusion, which is a mixture of factual and legal determinations, is one that disposes of this entire case: Bevill's only claimed damages—lost profits—were not caused by the claimed breach of contract—Sprint's attempt to terminate the contract for convenience.  In other words, Sprint's mere *attempt* to terminate the Contract does not give rise to an action for lost profits allegedly sustained because the contract was terminated.  *Cf. Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 51 F. App'x 786, 796–77 (10th Cir. 2002) (vacating a jury award of damages because the plaintiff claimed that the defendant breached the contract by failing to give ninety-days notice before terminating, but presented damages stemming only from actual termination of the contract).  The causal connection is missing.  Even assuming that Sprint breached the contract by giving Bevill notice of termination for convenience without first giving all due effort to reach an agreement on a cure plan or the future direction of the program, Bevill failed to show that if Sprint had given "all due effort," the parties could have reached an agreement that would have resulted in the lost profits that Bevill claims.  Bevill's performance and ability to generate profits was only affected (if at all) upon *actual* termination of the contract.  Because Bevill failed to show damages caused by Sprint's alleged breach, Bevill is not entitled to relief.  The court also makes the following alternative rulings.

### Termination for Convenience

55.   The court has found that Sprint used "all due effort" to attempt to agree on a cure plan or the future direction of the program.  But there was no agreement possible on a cure plan or the future direction of the program.  The parties could not agree on the correct standard by which

-12-

to judge the three-month trial period. Without an agreed-upon standard, the parties could not have developed a cure plan. Sprint therefore did not breach the contract by attempting to terminate the contract for convenience because Sprint complied with the requirements of the contract before giving notice.

**Termination for Cause**

56.    The Court concludes that Sprint properly terminated the Contract for cause. Sprint notified Bevill of termination of the Contract for cause in mid-March 2002 (to be effective in thirty days), more than thirty-one days before the termination for convenience and for cause simultaneously became effective on April 30, 2002.

57.    Sprint was justified in terminating the Contract for cause in light of Bevill's own material breaches of the contract.

58.    Bevill's material breaches relieved Sprint from further performance and excused any breach of contract in connection with the April 30, 2002 termination. *See, e.g., Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, 918 F. Supp. 343, 349 (D. Kan. 1996) (citations omitted) ("A sufficiently material, uncured breach of the good faith and fair dealing term will suspend and then terminate the nonbreaching party's performance."); *see also* Restatement (Second) of Contracts § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances . . . that there be no uncured material failure by the other party to render any such performance due at an earlier time.").

**Damages**

59.    The Contract is not ambiguous as to whether it was for dial-up services only or also DSL. Dial-up is specifically mentioned several times within the Contract. DSL is not mentioned. Although the Contract references internet service several times without specifying the

method for providing the service, the court concludes that these references do not render the Contract ambiguous.

60.    Even if the Contract were ambiguous as to whether Bevill would provide DSL service, extrinsic evidence of the parties' intent at the time they entered into the Contract indicates that they agreed only to dial-up services.

61.    Bevill failed to prove the element of damages.  In light of the court's factual findings above, Bevill did not show to a reasonable certainty that it would have made any profits under the Contract had the Contract remained in effect.  *See Olathe Mfg., Inc. v. Browning Mfg.*, 915 P.2d 86, 103–04 (Kan. 1996).  In reaching this conclusion, the court has taken into account the fact that Bevill was a start-up company, and accordingly has not relied solely on Bevill's historical failure to make a profit.  Rather, the court has made this decision based on testimony presented at trial, the evidence demonstrating Mr. Bevill's business practices, the terms of the Contract, and the viability of dial-up as a long-term internet solution, as evidenced by soldiers telling Mr. Bevill that they wanted high speed access instead of dial-up.

## Conclusion

For all of the above-stated reasons, the court finds that Bevill is not entitled to relief.  As a final note, at the close of Bevill's case and the trial, the court took Sprint's motion for judgment as a matter of law and renewed motion under advisement.  In those motions, Sprint argued that Bevill had not proved the element of damages.  The court now denies Sprint's motions as moot in light of the court's rulings in this Memorandum and Order.

**IT IS THEREFORE ORDERED** that Bevill's claims are denied.  Judgment shall be entered in favor of Sprint.

-14-

**IT IS FURTHER ORDERED** that Sprint's motion for judgment as a matter of law and renewed motion for judgment as a matter of law are denied as moot.

Dated this 5th day of February 2008, at Kansas City, Kansas.

<u>**s/ Carlos Murguia**</u>
**CARLOS MURGUIA**
**United States District Judge**